438 S.E.2d 886

**CLEO A. E., Plaintiff Below, Appellee,**

v.

**RICKIE GENE E., Former Husband, Defendant Below, Appellee,**

v.

**AMBER DAWN E. and the West Virginia Department of Health and Human Resources Child Advocate Office, Appellants.**

No. 21704.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 28, 1993.

Decided Dec. 16, 1993.

Cleo A.E., pro se.

Rickie Gene E., pro se.

Robert E. Wilkinson, Child Advocate Atty., Huntington, for appellants.

WORKMAN, Chief Justice:

The Child Advocate Office ("CAO") brought this appeal to challenge the voluntary bastardization of a minor child. Having examined the record in this matter in conjunction with the issue presented, this Court concludes that the best interests of the child standard precludes the parties from entering into a stipulation which has as its effect the bastardization of a child born to the parties during their marriage.

Cleo and Rickie E. were married on May 24, 1981, in Mason County, West Virginia. Cleo and Rickie E. had two children—Sheila E. on January 19, 1981, and Amber Dawn E. ("Amber Dawn") on July 9, 1983. Cleo and Rickie E. last cohabitated in July 1985 and Cleo E. filed for a divorce on July 10, 1986. Through the final order of divorce, which was entered by the Mason County Circuit Court on August 11, 1986, Cleo E. was awarded custody of both children. No child support was awarded, however, based on the fact that Cleo E. had not made a request for support during the divorce proceedings.

On July 2, 1987, Cleo and Rickie E. entered into a written agreement whereby Rickie E. agreed to pay Cleo E. $250 per month for child support. The record bears no indication that this agreement was ever ratified by the circuit court, but the parties do not dispute the document's existence. In late 1991, the CAO located Rickie E. in Marion County, Florida, through its efforts to collect child support. The CAO filed a petition in the Circuit Court of Cabell County, West Virginia, on February 13, 1992, pursuant to the Uniform Reciprocal Enforcement of Support Act ("URESA"), West Virginia Code §§ 48A–7–1 to –41 (1992 & Supp.1993) to collect support payments.

On May 21, 1992, a hearing was held before the Circuit Court for the Fifth Judicial Circuit in Marion County, Florida, on the URESA petition. Rickie E. appeared and challenged the petition's claim that he was the father of Amber Dawn.[1] He requested that HLA blood testing be performed to determine whether he was in fact the natural father of Amber Dawn. The Florida court ordered Rickie E. to pay $31.24 per week to the court as temporary support. Following the submission of briefs on the issue of whether Rickie E. could properly challenge the paternity of a child conceived during marriage in the Florida court, a second hearing was held on September 15, 1992, in Florida. At this hearing the court ruled that Rickie E. was the father of Amber Dawn and entered an order requiring Rickie E. to pay $62.40 per week to the court beginning September 7, 1992, for support arrearages which totaled $18,074 as of December 31, 1991. The Florida court reserved jurisdiction to modify both support and arrears retroactively upon its receipt of a modified final order of divorce from a West Virginia court.[2]

An amended final order of divorce was entered in West Virginia by the Mason County Circuit Court on October 26, 1992. The order referenced and attached a stipulation which set forth, inter alia, that Rickie E. was not the natural father of Amber Dawn.[3] It is unclear whether the circuit court held an actual hearing on this matter, but its order provides no reasoning for its decision to approve an amendment to the final order of divorce which had as its primary objective the bastardization of one of the children born to the parties during their marriage. The CAO brings this appeal seeking to have the amended final order of divorce set aside.

■ The CAO premises its position on the "nearly universal concept that a child born in wedlock is presumptively legitimate." As this Court explained in *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989): "Historically, society has frowned upon the bastardization of children. Thus, many states like West Virginia view a child as being presumptively legitimate if the child was born or conceived during a marriage." *Id.* at 402, 387 S.E.2d at 869. Recognizing that this presumption of legitimacy is rebuttable, we ruled in *Michael K.T.* that blood test evidence offered to disprove paternity should only be admitted after an in camera hearing has been held and various factors considered to determine "whether the equities surrounding the particular facts and circumstances of the case warrant admission of blood test results." *See id.* at 404, 387 S.E.2d at 871 and Syl. Pt. 2, in part. This Court further instructed in syllabus point four of *Michael K.T.* that "[a] guardian *ad litem* should be appointed to represent the interests of the minor child whenever an action is initiated to disprove a child's paternity." *Id.* at 400, 387 S.E.2d at 867.

The CAO argues that the guidelines established in *Michael K.T.* regarding the admissibility of blood test evidence should be extended to cases such as this which involve a stipulated disavowal of paternity. In *Michael K.T.*, we instructed courts to consider these factors:

(1) the length of time following when the putative father first was placed on notice that he might be the biological father before he acted to contest paternity;

(2) the length of time during which the individual desiring to challenge paternity assumed the role of father to the child;

---

1. Rickie E. claims that he learned through hearsay in late 1991 or early 1992 that a cousin of his was the true father of Amber Dawn.

2. The order of the Circuit Court of Marion County, Florida, dated September 15, 1992, does not state any reason for its finding that Rickie E. is the father of Amber Dawn. However, because the Florida court reserved jurisdiction to modify its order regarding both support and arrears retroactively upon its receipt of a modified final order from a West Virginia court, the implication is that the court thought that only the West

Virginia courts would have jurisdiction to make such a finding. *See* W.Va.Code § 48A–7–26 (URESA permits court to adjudicate paternity issue "if both of the parties are present at the hearing or the proof required in the case indicates that the presence of either or both of the parties is not necessary").

3. The stipulation was signed by Rickie E. on October 2, 1992, in Florida and by Cleo E. on October 26, 1992, in West Virginia.

(3) the facts surrounding the putative father's discovery of nonpaternity;

(4) the nature of the father/child relationship;

(5) the age of the child;

(6) the harm which may result to the child if paternity were successfully disproved;

(7) the extent to which the passage of time reduced the chances of establishing paternity and a child support obligation in favor of the child; and

(8) all other factors which may affect the equities involved in the potential disruption of the parent/child relationship or the chances of undeniable harm to the child.

*Id.* at 405, 387 S.E.2d at 872.

We determine initially that the parties to a domestic proceeding cannot by stipulation agree to bastardize children born during their marriage. Our conclusion is not founded on the traditional arguments against bastardization: the social stigma imposed on the child and the financial burden imposed on the state. As we discussed in *Michael K.T.*, "[t]hese two historical bases for opposing bastardization have been significantly vitiated given the modernization of society and legislation drafted to address the problems of bastardization." 182 W.Va. at 402–03, 387 S.E.2d at 869. Rather, we are once again guided by the cardinal principle that "the best interests of the child is the polar star by which decisions must be made which affect children." *Id.* at 405, 387 S.E.2d at 872. Furthermore, a child has a right to an establishment of paternity and a child support obligation, and a right to independent representation on matters affecting his or her substantial rights and interests.

Because it appears that consideration of Amber Dawn's best interests were totally ignored in the proceedings below, we conclude that a court cannot properly adjudicate the issue of paternity based on a stipulation between the parties. Given the serious and long-lasting effects of bastardization, resolution of the paternity issue should be accomplished with the active participation of the court, rather than involvement that is limited to reviewing a previously-executed document. This is necessary to guarantee that the issue of paternity is not used as a bargaining tool, perhaps to secure a favorable monetary award or some other preferred attainment. But, more importantly, it is required to secure proper consideration of the facts of the case in light of the best interests of the child and with due regard to the rights of the child. Accordingly, the guidelines which this Court identified in *Michael K.T.*, regarding the admission of blood test evidence on the issue of paternity, should similarly be utilized when making a ruling which has as its effect the bastardization of a minor child. *See* 182 W.Va. at 405, 387 S.E.2d at 872.

This case demonstrates vividly the need for a court-appointed attorney to represent the interests of a child whose paternity is at issue. Not only were the interests of Amber Dawn unrepresented during the drafting of the stipulation, but the court's approval of the document was also apparently made without any consideration for its impact upon her. Further, a hearing should have been held for the presentation of evidence on the factors enumerated in *Michael K.T.* such as: the length of time following when Rickie E. allegedly learned that he was not the natural father of Amber Dawn and when he took action to disprove paternity; the period of time during which Rickie E. assumed the role of father to Amber Dawn and the nature of their relationship; the harm which might result through disestablishment of paternity; and the extent to which the passage of time reduced the possibility that paternity can be established and child support obtained. *See id.*

Although historically courts have addressed issues affecting children primarily in the context of competing adults' rights, the present trend in courts throughout the country is to give greater recognition to the rights of children, including their right to independent representation in proceedings affecting substantial rights. Consequently, we extend our previous ruling in *Michael K.T.* regarding the appointment of a guardian ad litem.[4] A guardian ad litem should be

4. In response to the *Michael K.T.* decision the Legislature amended West Virginia Code § 48–

appointed to represent the interests of a minor child whenever the issue of disproving paternity is involved in a proceeding, regardless of whether the proceeding was initiated for the sole purpose of disproving paternity.[5] Furthermore, if paternity of a child is abrogated, the guardian ad litem should seek to establish legal paternity and child support.[6]

The CAO suggests that a finding of fraud against Cleo E. is necessary to overcome the res judicata doctrine established by this Court in *State ex. rel. West Virginia Dep't of Health and Human Resources v. Cline*, 185 W.Va. 318, 406 S.E.2d 749 (1991). We ruled in *Cline* in syllabus point two that "[a]n adjudication of paternity, which is expressed in a divorce order, is *res judicata* as to the husband and wife in any subsequent proceeding." 185 W.Va. at 319, 406 S.E.2d at 750 (quoting Syl. Pt. 1, in part, *Nancy Darlene M. v. James Lee M., Jr.*, 184 W.Va. 447, 400 S.E.2d 882 (1990)). The *Cline* decision also referenced this Court's statement in *Michael K.T.* that "absent evidence of fraudulent conduct which prevented the putative father from questioning paternity, this Court will not sanction the disputation of paternity through blood test evidence if there has been more than a relatively brief passage of time." 185 W.Va. at 321, 406 S.E.2d at 752 (quoting *Michael K.T.*, 182 W.Va. at 405, 387 S.E.2d at 872). Certainly, evidence of fraud on the part of Cleo E. of withholding information from Rickie E. concerning the identity of Amber Dawn's biological father would be relevant on remand if the circuit court is required to rule on blood testing, or ultimately, when it makes its ruling regarding the paternity of Amber Dawn.

Based on the foregoing, the decision of the Circuit Court of Mason County is hereby reversed and remanded for additional proceedings consistent with this opinion.

Reversed and remanded.

---

2–11 (Supp.1993) to include subsection (b) which reads as follows:

> If, in an action for divorce or annulment, either party shall allege that a person, other than the husband, is the father of a child born during the marriage of the parties, the court shall appoint a competent attorney to act as guardian ad litem on behalf of the child. The attorney shall be appointed without motion and prior to an entry of any order requiring blood testing.

W.Va.Code § 48–2–11(b).

**5.** This Court's decision in *Michael K.T.* arguably permits the appointment of a guardian ad litem presently in such cases given the directive contained therein that "a guardian *ad litem* should be appointed to represent the interests of the minor child whenever the issue of disproving paternity is raised outside of a proceeding contemplated by W.Va.Code § 48A–6–1." 182 W.Va. at 406, 387 S.E.2d at 873. Because, however, the issue of Amber Dawn's paternity was resolved through a stipulation rather than any specific court proceeding, we resolve any potential confusion by creating a separate syllabus point addressing this issue; in actuality, our ruling regarding the required appointment of a guardian ad litem is more of a clarification than an extension.

**6.** In *Michael K.T.*, we pointed out that the fees of a guardian ad litem in a divorce or related domestic relations action should be paid by the party most able to bear that cost. 182 W.Va. at 406, 387 S.E.2d at 873. In the event paternity is disproved, the court should appoint the guardian for the child, and the guardian should act expeditiously to establish actual paternity and to obtain entry of a child support award.