495 S.E.2d 836

**William L., III, Plaintiff
Below, Appellant,**

v.

**Cindy E.L., Defendant Below, Appellee.**

No. 24120.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 16, 1997.

Decided Oct. 3, 1997.

Concurring Opinion of
Chief Justice Workman
Dec. 17, 1997.

Dissenting Opinion of
Justice Maynard Dec. 17, 1997.

Michael C. Farber, Sutton, for the Appellant.

Cindy E.L., Appellee Pro Se.

PER CURIAM.[1]

■ This action is before this Court upon an appeal from the final order of the Circuit Court of Kanawha County entered on October 1, 1996. The issue before this Court arose out of the divorce action between the appellant, William L., III,[2] and the appellee, Cindy E. L., and concerns the paternity of a child born during their marriage. Appellant contends that the circuit court erred in adopting the recommendation of the family law master that paternity test results would not be admitted into evidence and that the presumption of paternity would stand due to the long period of time during which the parties resided together as husband and wife and during which the child's paternity was not questioned.

This Court has before it the petition for appeal, the record as designated by the appellant,[3] the brief of appellant's counsel, and the brief of appellee, pro se. As discussed below, this Court is of the opinion that the circuit court did not err in adopting the recommendation of the family law master. Unfortunately, the record is sparse and the parties assert conflicting facts. Obviously, we are limited to the record before us. The result we reach in this case may have been different if we had a more complete record. Based upon this record, therefore, we affirm the final order.

I

The parties were married in 1984, and James L. was born in January 1987. The parties separated in November 1991, and appellant filed for divorce a month later. In his complaint, appellant alleged that the paternity of James L. was uncertain. Based upon this allegation, the parties were ordered to undergo blood testing to determine the paternity of the child. On September 10, 1992, a divorce decree was entered on the grounds of irreconcilable differences. All issues other than the divorce were bifurcated for determination at a later date.

Subsequently, the blood test results, which indicated that appellant was not the father of James L., were lodged in the court file.[4] Appellee objected to any admission of the test results until an *in camera* hearing could be conducted to determine whether their admittance was proper. On March 31, 1993, an

---

1. We point out that a per curiam opinion is not legal precedent. *See Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 606 n. 4 (1992) ("Per curiam opinions ... are used to decide only the specific case before the Court; everything in a per curiam opinion beyond the syllabus point is merely *obiter dicta*.... Other courts, such as many of the United States Circuit Courts of Appeals, have gone to non-published (not-to-be-cited) opinions to deal with similar cases. We do not have such a specific practice, but instead use published per curiam opinions. However, if rules of law or accepted ways of doing things are to be changed, then this Court will do so in a signed opinion, not a per curiam opinion.").

2. We follow our practice in domestic relations cases involving sensitive matters and use initials to identify the parties, rather than full names. *In*

*the matter of Jonathan P.*, 182 W.Va. 302, 303 n. 1, 387 S.E.2d 537, 538 n. 1 (1989).

3. The record before this Court reflects that appellant designated a transcript of proceedings held before the family law master on March 31, 1993. However, the index page of the designated record submitted by the circuit clerk to this Court notes that said transcript "is not a part of the Court file." In addition, a post-it note attached to the same index page and signed by a deputy circuit clerk states that "requests for additional designation were not responded to."

4. The blood test results are not part of the record before this Court. However, it is undisputed by the parties and in the portion of the record that is before this Court that appellant is not the father of James L.

*in camera* hearing was held. According to the family law master's order, appellee testified that at the time of the birth of the child, she asked the appellant to have blood tests and he refused. She stated that blood tests were also discussed with appellant two years later, and he again said no to testing. During this time, and until the separation, appellant acted as a normal father towards James L. and the parties' other children.

Appellee further testified about the identity of the biological father of James L. Appellee claimed that she last saw the biological father of James L. four years ago, and she did not remember his last name.[5] According to the family law master's order, appellant also testified at the *in camera* hearing. He denied ever talking about the child's paternity or mentioning blood tests until the divorce.

Following the hearing, the family law master entered an order recommending that the paternity test results not be admitted because appellant had held himself out to be the father of James L. for a sufficient period of time making evidence disproving paternity not in the child's best interests. The recommendation was adopted by the circuit court as reflected in the final order.

## II

On numerous occasions, this Court has set forth the applicable standard of review for a recommended order of a family law master. We have observed that such orders are reviewable by a circuit court pursuant to statute, *W. Va.Code,* 48A–4–16 [1997], *W. Va.Code,* 48A–4–20 [1993], and pursuant to this Court's *Rules of Practice and Procedure for Family Law.* We also recently stated in syllabus point 2 of *Pearson v. Pearson,* 200 W. Va. 139, 488 S.E.2d 414 (1997): "A circuit court should review findings of fact made by a family law master only under a clearly erroneous standard, and it should review application of law to the facts under an abuse of discretion standard." *See also* syl. pt. 1, *Stephen L.H. v. Sherry L.H.,* 195 W.Va. 384, 465 S.E.2d 841 (1995). In syllabus point 3 of *Pearson,* we noted that

"[u]nder the clearly erroneous standard, if the findings of fact and the inferences drawn by a family law master are supported by substantial evidence, such findings and inferences may not be overturned even if a circuit court may be inclined to make different findings or draw contrary inferences." *See also* syl. pt. 3, *Stephen L.H.* Finally, we stated in syl. pt. 1 of *Pearson:*

'In reviewing challenges to findings made by a family law master that were also adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretation are subject to a *de novo* review.' Syl. Pt. 1, *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995).

Appellant contends that the paternity test results should have been admitted because the appellee has fraudulently and intentionally refused to identify the actual putative father, and therefore, the decision unjustly enriches her and allows the biological father to escape his financial obligation to the child. The issue of whether paternity test results disproving paternity should be admitted into evidence first came before this Court in the case of *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 387 S.E.2d 866 (1989). In syllabus point 3, this Court held:

A trial judge should refuse to admit blood test evidence which would disprove paternity when the individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child.

*See also* syl. pt. 1, *State ex rel. David Allen B. v. Sommerville,* 194 W.Va. 86, 459 S.E.2d 363. In so holding, we recognized that "the law favors the innocent child over the putative father in certain circumstances." 182 W.Va. at 405, 387 S.E.2d at 872. Although

---

5. The family law master found the appellee's testimony to be "conflicting, often contradictory, first stating something, then denying it, and generally often not trustworthy."

we did not establish a finite period of time which must pass before blood test evidence is admissible, we did state that "absent evidence of fraudulent conduct which prevented the putative father from questioning paternity, this Court will not sanction the disputation of paternity through blood test evidence if there has been more than a relatively brief passage of time." *Id.*

■ As previously mentioned in note 3, *supra,* a transcript of the proceedings before the family law master is absent from the record. In the past, this Court has emphasized that designation of the record is important. *State v. Honaker,* 193 W.Va. 51, 56 n. 4, 454 S.E.2d 96, 101 n. 4 (1994). "[W]e take as nonexisting all facts that do not appear in the designated record and will ignore those issues where the missing record is needed to give factual support to the claim." *Id.* While the family law master's recommendation does relate some of the testimony presented at the *in camera* hearing, it does not lend factual support to the appellant's allegations. Absent a sufficient record to justify appellant's contentions, the family law master's findings of fact were not clearly erroneous.[6]

We note that the family law master found that appellant had assumed the role of father to James L. for more than a relatively brief passage of time as a normal father/child relationship existed for four years. The family law master further determined that appellant had also been on notice that he might not be the biological father for approximately four years before he acted to contest paternity. Although the appellant urges this Court to expand our interpretation of *Michael K.T.,* we find that the decision in this case, as

presented to this Court, preserves the best interests of the child.

This Court hereby orders that the final order of the Circuit Court of Kanawha County be affirmed.

Affirmed.

WORKMAN, Chief Justice, concurring:

I concur to reiterate the importance of our decision in *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 387 S.E.2d 866 (1989), as applied to *William L. v. Cindy E.L.* and to point out the shortcomings of the dissenting opinion to *William L.*

To adopt the reasoning of the dissenter to *William L.* is to view the law solely in shades of black and white and to neglect what is necessarily in the best interests of the child involved. To succinctly state the dissenter's position, if conclusive blood tests exclude a putative father as the natural father of the child, as was the case in *William L.,* then such evidence should be admissible to disprove paternity, despite the impact on the child involved and no matter how long the individual has held himself out to be the father of the child.

The dissenting opinion places much weight on the father's testimony (despite the fact that we have no record of testimony!), wherein the putative father apparently testified that he never spoke about the child's paternity or mentioned blood tests until after the divorce. It is evident from the family law master's order, however, that the testimony was disputed.[1] Both the family law master

---

**6.** At this point, we note that appellant also contends that the circuit court erred in failing to appoint a guardian *ad litem* to represent the child. The sparse record that is before this Court indicates that the error was not raised below. We have long since held that objections not made in the trial court and which are not jurisdictional in character will not be considered on appeal. *See* syl. pt. 1, *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964). Because it appears that this issue was raised for the first time on appeal, it is not properly before this Court. However, we do not abandon our position as set forth in syllabus point 4 of *Michael K.T.,* and clarified in syllabus point 5 of *Cleo A.E. v. Rickie Gene E.,* 190 W.Va. 543, 438 S.E.2d 886 (1993), that a guardian *ad litem* should be ap-

pointed to represent the interests of the minor child in actions seeking to disprove a child's paternity. In fact, we urge trial judges to be cognizant of the importance of appointing guardians *ad litem* in these cases.

**1.** The mother testified that at the time of the child's birth, she asked the putative father, her husband, to have blood tests and he refused. Further, she stated that blood tests were discussed with her spouse two years later, and again, he refused. Most importantly, during this time, the family law master found that the putative father "*acted as a normal father towards James L.*" Majority opinion at 3 (emphasis added).

and the circuit court, who had the parties before them, chose to believe the Appellee and now the dissenter wants us to reject the factual findings of the family law master and circuit court without even having a record!

As we stated in *Michael K.T.*, "absent evidence of fraudulent conduct which prevented the putative father from questioning paternity, this Court will not sanction the disputation of paternity through blood test evidence if there has been more than a relatively brief passage of time." 182 W.Va. at 405, 387 S.E.2d at 872. Unfortunately, this Court's review is limited to the record before us. It is very difficult under our standard of review[2] to usurp the findings of the fact of the factfinder, but certainly we cannot disturb findings of fact when we do not even have a factual record.

I write separately also to re-emphasize that the concepts behind *Michael K.T.* are based on sound public policy. Further, the law favors "the innocent child over the putative father in certain circumstances." *Id.* What the majority placed emphasis on in reaching its decision is that the lower court obviously determined that the more time that elapsed that the putative father may very well have known that he was not the natural parent (yet raised no dispute as to paternity), the greater the deterioration of the child's opportunity for finding, knowing and loving his natural father. *Id.* (quoting *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416, 419 (1976).)

Based on the foregoing, I respectfully concur with the majority opinion.

MAYNARD, Justice, dissenting:

I dissent because I believe the rule of equitable estoppel, stated in the syllabus point of the majority opinion, should not be applicable to the facts of this case.

Originally set forth in Syllabus Point 3 of *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 387 S.E.2d 866 (1989), this rule states:

A trial judge should refuse to admit blood test evidence which would disprove paternity when the individual attempting to disestablish paternity has held himself out to be the father of the child for a sufficient period of time such that disproof of paternity would result in undeniable harm to the child.

The rule is based on this Court's determination that "the best interests of the child is the polar star by which decisions must be made which affect children," *Michael K.T.*, at 405, 387 S.E.2d at 872, and "the law favors the innocent child over the putative father in certain circumstances." *Id.* Although I believe the basic premise that the best interest of the child should be the cynosure in cases affecting children, I do not believe that this premise mandates the use of the above-stated rule in many cases where the presumption of paternity is sought to be rebutted by the use of *conclusive* blood tests.

At the outset, I note that cases like the instant one present the Court with especially difficult choices because the competing interests involved often concern two innocent parties. In such cases, more so than in others, a Solomonic wisdom is called for, and this Court's scholarship coupled with compassion in its constant struggle to approach such wisdom is admirable. Nevertheless, I believe that the rule formulated by the Court in *Michael K.T.* and utilized here, sweeps too broadly so as to bring about grossly unjust results.

In its use of this rule, the Court attempts to weigh the interests of the innocent child against those of the putative father and finds the interests of the child preeminent. In *Michael K.T.*, the Court relied heavily on the reasoning of the court in *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976). In that case, the putative father was denied the use of blood tests to disprove his paternity of a child he had supported financially for approximately three years before denying paternity and six years before finally requesting blood tests. The court concluded that the putative father was equitably estopped from denying paternity. The *Andreas* court explained:

In short, equitable estoppel, reduced to its essence, is a doctrine of fundamental

2. *See* Syl. Pts. 1 and 3, *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 465 S.E.2d 841 (1995).

fairness designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely upon that conduct to his or her detriment.

*Andreas,* Pa.Super. at 311–312, 369 A.2d at 418.

The court then applied this doctrine to cases in which paternity is sought to be disproved.

Absent any overriding equities in favor of the putative father, such as fraud, the law cannot permit a party to renounce even an assumed duty of parentage when by doing so, the innocent child would be victimized. Relying upon the representation of the parental relationship, a child naturally and normally extends his love and affection to the putative parent. The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection and support of the natural father. As time wears on, the fiction of parentage reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father. While the law cannot prohibit the putative father from informing the child of their true relationship, it can prohibit him from employing the sanctions of the law to avoid the obligations which their assumed relationship would otherwise impose.

*Id.,* 245 Pa.Super. at 312, 369 A.2d at 419.

Stated succinctly, the reasoning of the Court seems to be that by assuming the responsibilities of paternity, the putative father induced the child to reasonably expect continued love, affection, and financial support. By doing this, the putative father knew or should have known that the child would rely on the putative father's support to the child's detriment. Apparently, the detriment is that by taking on himself the care and support of the child, the putative father foreclosed any possibility that the natural father would have assumed that role. I believe there are several problems with such reasoning in cases like the instant one. These problems were cogently set forth by the Court of Appeals of Virginia in *NPA v. WBA,* 8 Va.App. 246, 380 S.E.2d 178 (1989).

In *NPA,* the court was asked to "decide whether a husband (WBA) who is not the biological father of his wife's child can be required to support the child after divorce when he has reared and supported the child for the five years since birth under the false belief that he was the child's father." *NPA,* 8 Va.App. at 248, 380 S.E.2d at 179. The wife argued that the husband should be equitably estopped from denying his duty to support the child. "Assuming without deciding that child support by estoppel exists as a basis ... to prohibit a husband from terminating his support commitment to his wife's illegitimate child," *id,* 8 Va.App. at 253, 380 S.E.2d at 182, the court determined that the requirements for equitable estoppel did not exist under the facts of the case. The court explained:

Although the husband had assumed the role of father for the child's entire life, he did not knowingly misrepresent to the child that he was his natural father. Throughout the husband's relationship with the child, he acted under the mistaken belief that he was the child's natural father and supported the child. That he might have had a question or doubt as to his paternity at the child's birth, does not establish an intent to falsely represent himself to the child as the natural father. Furthermore, the child suffered no detriment by having been cared for and supported during the five year relationship where no legal duty to do so existed. In fact, the child has received the benefit of the husband's love and support. The husband's voluntary support of the child during the marriage based upon his mistaken belief that he was the child's father does not deprive the wife or the child of his cause of action against the biological father for child support.

*Id.,* 8 Va.App. at 253–254, 380 S.E.2d at 182 (citations omitted).

I concur with the court's reasoning in *NPA,* and I believe this reasoning applies in the instant case. Here, the parties were married in 1984, and the child was born in January 1987. The parties separated in November 1991. The appellant filed for divorce a short time later and alleged that the child's pater-

nity was uncertain. According to his disputed testimony, the appellant denies ever talking about the child's paternity or mentioning blood tests until the divorce. This is in contrast to the facts in *Andreas* where the parties were not married until six months after the child's birth, and the wife was already the mother of two illegitimate children. In light of these facts, the *Andreas* court noted that the putative father "had both sufficient opportunity and motivation for questioning the paternity of the child before he decided to marry appellee[.]" *Andreas*, 245 Pa.Super. at 313, 369 A.2d at 419. Further, the putative father in *Andreas* did not move to disprove paternity through the use of blood test evidence until four years after the separation and three years after first denying paternity when the child was almost seven years old. The court concluded that the putative father lacked diligence in instituting his action.

I believe, therefore, that our rule of equitable estoppel is not applicable in the instant case. I emphasize that it is *not* my contention that equitable estoppel is never applicable where a putative father seeks the admission of blood test evidence to rebut the presumption of paternity. It is my belief, however, that blood test evidence which *conclusively excludes* a man as the father of a child should be admitted where there is evidence that the putative father had no reason, at an earlier point in time, to question the paternity of the child. I believe that this is only fair.

Also, as noted above, this Court's purpose in utilizing the equitable estoppel rule in cases like the present one is to protect the best interests of the child. These interests involve much more than financial support. They also include love, affection, and all the intangibles involved in a father's nurturing of a child. It is, therefore, the Court's desire that the putative father will continue to show the child love and affection even after it becomes apparent that he is not the child's biological father. In a perfect world that is what should happen. This Court, however, simply by the entry of a court order, cannot compel the giving of love and affection any more than it can change the weather. The Court's poor powers in this area are limited to ensuring continued financial support. Such financial support is, of course, beneficial to the child, but falls far short of what constitutes the child's best interests. Sadly, once a putative father goes to court to avoid any financial obligation, the odds are that he is not prepared to continue in a caring relationship with the child. By mandating that the putative father continue to provide financial support, the Court is likely to engender bitterness and resentment, a result which is completely contrary to what the Court intends.

Finally, in *Michael K.T.*, this Court stated that "*absent evidence of fraudulent conduct which prevented the putative father from questioning paternity*, this Court will not sanction the disputation of paternity through blood test evidence if there has been more than a relatively brief passage of time." *Michael K.T.*, 182 W.Va. at 405, 387 S.E.2d at 872 (emphasis added). I believe that fraudulent conduct exists in every case where a wife gives birth to a child cognizant of the fact that paternity is uncertain, yet remains silent while her husband innocently assumes the care of the child. In such cases the burden should be upon the wife to show that her husband was put on notice that he may not be the child's biological father before he undertook or continued to undertake the care of the child. In matters such as these, the law should reward trust where reason for distrust is absent.

In conclusion, I believe that the Court disposes of this case with a rule that sweeps too broadly and thus, in some instances, produces harsh and unfair results. I believe that this is one such instance. Therefore, I respectfully dissent.